The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically on December 27, 2022, which may be different from its entry on the record.

**IT IS SO ORDERED.**

Dated: December 27, 2022



ARTHUR I. HARRIS
UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| GUERINO & CRYSTAL L. CONTE, | ) | Case No. 21-13189 |
| Debtors. | ) | |
| | ) | Judge Arthur I. Harris |
| | ) | |
| GBAZ, INC., | ) | |
| Plaintiff. | ) | |
| | ) | Adversary Proceeding |
| v. | ) | No. 21-1078 |
| | ) | |
| CRYSTAL L. CONTE, *et al.*, | ) | |
| Defendants. | ) | |

MEMORANDUM OF OPINION[1]

In this adversary proceeding, the plaintiff, GBAZ, Inc., asserts that this Court should deem nondischargeable under 11 U.S.C. § 523(a)(2)(B) a $68,500

---

[1] This Opinion is not intended for official publication.

judgment that it obtained against the debtors, Mr. and Mrs. Conte, in connection with their purchase of GBAZ's pizza franchise in Brunswick, Ohio. GBAZ contends that the Contes submitted a personal financial statement that misrepresented their net worth and that GBAZ reasonably relied on the statement's inflated figures in deciding to extend them a loan. On December 12, 2022, the Court held a trial on GBAZ's nondischargeability claim. For the reasons that follow, the Court finds that GBAZ has failed to establish by a preponderance of the evidence that it reasonably relied on the misrepresentations in the Contes' financial statement. The Court therefore enters judgment in favor of the debtors.

JURISDICTION

This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). The Court has jurisdiction over core proceedings under 28 U.S.C. §§ 157(a) and 1334 and Local General Order 2012-7, entered by the United States District Court for the Northern District of Ohio.

PROCEDURAL HISTORY

On September 20, 2021, the Contes filed for chapter 7 bankruptcy (Case No. 21-13189). On October 18, 2021, the chapter 7 trustee held the § 341 meeting of creditors. Three days later, the trustee filed a no asset report (Case No. 21-13189, Docket No. 12). On December 20, 2021, GBAZ filed this

2

adversary proceeding.  On December 29, 2021, the Contes received their chapter 7 discharge (Case No. 21-13189, Docket No. 21).

On February 22, 2022, the Contes filed an answer to GBAZ's complaint (Docket No. 6).  That same day, they also moved to dismiss the adversary proceeding for GBAZ's failure to meet the December 17, 2021, deadline under Bankruptcy Rule 4007(c) to file a nondischargeability complaint (Docket No. 7). On April 25, 2022, the Court denied the Contes' motion to dismiss under the principle of equitable tolling (Docket Nos. 11 and 12).  On September 6, 2022, GBAZ filed a motion for summary judgment, but it failed to serve its motion on the Contes (Docket No. 17).  Though the Contes retained counsel in their main bankruptcy case, they represented themselves in this adversary proceeding.  The Court directed GBAZ to correct service and file an amended certificate of service by October 12, 2022 (Docket No. 18).  The Court also directed the Contes to respond to GBAZ's motion by October 26, 2022 (Docket No. 18).  GBAZ corrected service and filed an amended certificate of service the same day of the Court's order (Docket No. 19).  The Contes never filed a response.  On December 12, 2022, the Court denied GBAZ's motion for summary judgment, concluding that genuine issues of material fact remained regarding both the

3

reasonableness of GBAZ's reliance and the Contes' intent (Docket Nos. 21 and 22).

On December 12, 2022, the Court held a trial on GBAZ's nondischargeability claim. During the plaintiff's case-in-chief, the Court heard testimony from Fadi Bukzam, CEO of GBAZ, and Mrs. Conte. Mrs. Conte also testified in narrative format during the debtors' case-in-chief. GBAZ recalled Mr. Bukzam in rebuttal. The Court received GBAZ's exhibits A, B, C, E, and F without objection.

This memorandum constitutes the Court's findings of fact and conclusions of law required by Bankruptcy Rule 7052.

## FACTUAL HISTORY

The findings of fact contained in this memorandum of opinion reflect the Court's weighing of the evidence, including the credibility of each witness. In doing so, "the [C]ourt considered the witnesses' demeanor, the substance of the testimony, and the context in which the statements were made, recognizing that a transcript does not convey tone, attitude, body language or nuance of expression." *In re Parrish*, 326 B.R. 708, 711 (Bankr. N.D. Ohio 2005). Even if not specifically mentioned in this decision, the Court considered the testimony of the trial

4

witnesses and the exhibits admitted into evidence. Unless otherwise indicated, the following facts were established at trial by a preponderance of the evidence.

In early 2018, Mr. Bukzam, CEO of GBAZ, decided to sell his Giorgio's Oven Fresh Pizza franchise in Brunswick, Ohio, because he wanted to spend more time with two ailing family members. He notified the franchisor of his intention and began looking for a potential buyer. In the spring of the same year, Mr. Bukzam met Mrs. Conte at the coffee shop she ran inside the Brunswick Medical Center. After speaking with her on three previous occasions, Mr. Bukzam asked her if she would be interested in purchasing his pizza franchise. He was impressed by the way she ran her coffee shop and believed she could successfully run his franchise.

Mr. Bukzam was close personal friends with the Giorgio's Oven Fresh Pizza franchisors. He knew what they would require for Mrs. Conte to purchase his franchise. Mr. Bukzam told Mrs. Conte that he needed her resume, a personal financial statement, and a franchise application. During this initial meeting, Mrs. Conte explained to Mr. Bukzam that she had no experience with running a pizza restaurant and did not have the money to purchase the franchise outright.

On July 13, 2018, Mrs. Conte personally completed the franchise application and gave it to Mr. Bukzam (Ex. B). On the franchise application, Mrs. Conte

5

answered that she owned her own home and that it was worth $295,000 with a mortgage of $162,000. She listed that she had approximately $9,000 in a bank account. Mrs. Conte left blank the spaces for total assets, total liabilities, and net worth. The franchise application also asked for educational background. Mrs. Conte answered that she graduated high school, went to college for three years but did not finish, and had her real estate license. Lastly, Mrs. Conte signed below the "release of information" paragraph, authorizing an investigation into her financial background.

Mrs. Conte also provided Mr. Bukzam her resume at this time. Though neither party offered the resume into evidence, Mr. Bukzam testified that he found it very impressive. Mrs. Conte lacked specific experience in the pizza business, but Mr. Bukzam believed that her resume showed she had the aptitude and diligence to successfully run his franchise.

That same month, Mr. Bukzam helped Mrs. Conte prepare a personal financial statement (Ex. C). The parties dispute who typed the document, but both agree that Mrs. Conte ultimately emailed it to Mr. Bukzam, who then sent it to the franchisors. On the financial statement, Mrs. Conte listed a net worth of $618,000, mostly comprising of her and her husband's home valued at $280,000, nonspecific business inventory worth $250,000, a life insurance policy with a cash surrender

6

value of $175,000, and cash and cash equivalent of $30,000. Mrs. Conte disclosed that she and her husband had $162,000 remaining on their mortgage as well as car loans and credit card debt totaling another $35,800.

Mr. Bukzam drove by the Contes' home to verify its location and approximate value. He also saw Mrs. Conte's vehicle and confirmed it was what she listed in her financial statement. Mr. Bukzam did not validate the cash surrender value of the life insurance policy, the existence of the purported $250,000 in business inventory, or the $30,000 in cash and cash equivalent.

During the plaintiff's questioning of Mrs. Conte, she evaded answering whether she inflated the figures on her personal financial statement. During her case-in-chief, however, Mrs. Conte admitted that the amounts for the business inventory, the life insurance policy's cash surrender value, and the cash and cash equivalent were false. Specifically, she did not have $30,000 in cash or its equivalent. While her husband did have a life insurance policy with $175,000 in coverage, it did not have a cash surrender value of that amount. Lastly, Mr. Conte worked as a handyman, and the couple had no business inventory at all. Mrs. Conte explained that Mr. Bukzam helped her inflate her net worth so that the franchisors—Mr. Bukzam's close friends—would approve her franchise application. While Mr. Bukzam testified that he believed the information in the

7

personal financial statement was true, the Court found Mrs. Conte's explanation more credible.

From July 2018 until November 2018, Mrs. Conte worked as Mr. Bukzam's employee at his Giorgio's Oven Fresh Pizza franchise. The parties intended for Mrs. Conte to learn the business and, in Mrs. Conte's words, determine whether running the franchise would be a "good fit." She earned $9.00 an hour during this timeframe but did not receive a paycheck. What she earned went towards a deposit for her anticipated purchase of the franchise.

On October 1, 2018, Mrs. Conte created "Conte Pizza Inc." so that it could be the purchaser of the franchise (Ex. E). On November 5, 2018, the Contes and Mr. Bukzam entered into a capital lease and management agreement (Ex. A). In exchange for the right to operate the franchise and lease the restaurant equipment, the Contes agreed to pay Mr. Bukzam a total of $70,000, payable in $1,500 monthly installments. Mr. and Mrs. Conte personally guaranteed payment under the agreement (Ex. C., pp. 27-29). The franchisor normally required a $15,000 fee to transfer ownership of the franchise; however, Mr. Bukzam convinced the franchisor to waive this fee.

Mrs. Conte testified that she understood the agreement to merely allow her to manage the franchise. She believed any profit earned would go to Mr. Bukzam

8

21-01078-aih    Doc 27    FILED 12/27/22    ENTERED 12/27/22 13:03:19    Page 8 of 19

rather than to her. In any event, the franchise never earned a profit during the approximately two years Mrs. Conte ran it.

On September 21, 2020, Mrs. Conte and Mr. Bukzam exchanged text messages about Mrs. Conte applying for a Small Business Administration loan, apparently to pay in full what was due under the capital lease and management agreement (Ex. F). Mrs. Conte did not ultimately pursue the loan. In November 2020, she notified Mr. Bukzam that she planned to close the franchise location. She walked Mr. Bukzam through the restaurant to verify the condition of the equipment and gave Mr. Bukzam the keys.

The parties dispute how many payments Mrs. Conte made under the capital lease and management agreement. Mrs. Conte testified she made four payments while Mr. Bukzam said he received only one. No matter the exact amount, Mrs. Conte made nowhere near the number of required payments. On April 27, 2021, GBAZ obtained a judgment against the Contes in the Cuyahoga County Court of Common Pleas for $68,500, plus interest, for failing to pay the amount due under the agreement (Pl.'s Mot. Summ. J., Ex. D). Before GBAZ could execute the judgment, the Contes filed for chapter 7 bankruptcy (Case No. 21-13189, Docket No. 1).

In their schedules, the Contes disclosed, among other things, that they owned a home worth $253,700 with $163,743.10 outstanding on the mortgage; two cars together worth $19,000 with $11,409 remaining on one car's lien; a life insurance policy with a surrender value of $0; and $1,500 in tools (Case No. 21-13189, Docket No. 1). The Contes also scheduled a 100 percent interest in "Conte Pizza, Inc.," which they declared went out of business in August 2020. Mr. Conte listed himself as a self-employed tile setter earning $3,762 per month. Mrs. Conte wrote she was not employed and earned no income. Their monthly expenses were $4,806.43.

## CONCLUSIONS OF LAW

In its sole claim, GBAZ asserts that its state court judgment against the Contes should be deemed nondischargeable under 11 U.S.C. § 523(a)(2)(B). This section prevents a debtor from receiving a discharge of a credit extension obtained by:

> (B) use of a statement in writing—
>
>     (i) that is materially false;
>
>     (ii) respecting the debtor's or an insider's financial condition;
>
>     (iii) on which the creditor to whom the debtor is liable for such . . . credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive[.]

GBAZ must prove each of these elements by a ponderance of the evidence. *Pazdzierz v. First Am. Title Ins. Co. (In re Pazdzierz)*, 718 F.3d 582, 586 (6th Cir. 2013) (citing *Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654, 661 (1991)). And this Court must strictly construe the exception to discharge against GBAZ. *Id*. (citing *Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998)).

First, the personal financial statement the Contes submitted to GBAZ was "a statement in writing" within the meaning of § 523(a)(2)(B). While it is unclear who actually typed the statement, Mrs. Conte admitted she submitted it to GBAZ as her own. *See Investors Credit Corp. v. Batie (In re Batie)*, 995 F.2d 85, 89 (6th Cir. 1993).

Second, a statement in writing is "materially false" if it "paints a substantially untruthful picture of the debtor's financial condition by misrepresenting information of a type which would normally affect the decision to grant credit." *Alside Supply Ctr. v. Kromar (In re Kromar)*, 258 B.R. 692, 697 (Bankr. N.D. Ohio 2001) (internal quotations and citation omitted). The "size of the discrepancy" may in part determine whether the false statement is material. *Agrifund, LLC v. Blankenship (In re Blankenship)*, No. 16-10839,

11

2019 WL 7602322, at *9 (Bankr. W.D. Tenn. Jan. 2, 2019), *aff'd*, No. 19-01045-STA-JAY, 2019 WL 5304212 (W.D. Tenn. Oct. 21, 2019) (citation omitted). Mrs. Conte admitted that the amounts in the personal financial statement for the business inventory, the life insurance policy's cash surrender value, and the cash and cash equivalent were wholly false. These three assets accounted for nearly 75 percent of the net worth listed in the Contes' personal financial statement. Given the false statements' relative size, they were material. *See Midwest Cmty. Fed. Credit Union v. Sharp (In re Sharp)*, 357 B.R. 760, 765 (Bankr. N.D. Ohio 2007).

Third, as statements of net worth, they were statements "respecting the [debtors'] financial condition." *See Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1764 (2018).

Therefore, the only questions left for the Court to consider are (1) whether GBAZ reasonably relied on the Contes' personal financial statement, and (2) whether the Contes provided the financial statement with the intent to deceive.

### 1. Reasonable Reliance

Reasonable reliance requires both that GBAZ actually relied on the misrepresentations in the personal financial statement (reliance in fact) and that GBAZ's reliance was reasonable. *Oster v. Clarkston State Bank (In re Oster)*,

474 F. App'x 422, 425 (6th Cir. 2012) (citing *Field v. Mans*, 516 U.S. 59, 68, 116 S. Ct. 437, 442 (1995)). This is a higher standard than "justifiable reliance" under § 523(a)(2)(A). *Id*.

The evidence elicited at trial suggests that Mr. Bukzam helped Mrs. Conte prepare the personal financial statement, knowing that some of the figures were false. The Court found credible Mrs. Conte's testimony that she repeatedly told Mr. Bukzam that her finances were poor and she could not purchase the franchise outright. Additionally, Mr. Bukzam testified that he was close friends with the franchisors and knew what they would require for Mrs. Conte to purchase the franchise. Mr. Bukzam likely knew that for the purchase to go through, the Contes needed to show a higher net worth than what they actually had.

Additionally, Mr. Bukzam repeatedly testified that he admired Mrs. Conte. Mrs. Conte initially impressed him with her diligence running her small coffee shop. Mr. Bukzam thought that same attribute would translate to successfully running his pizza franchise. When Mr. Bukzam saw Mrs. Conte's resume, he was further impressed. So much so that he said she looked like someone that could "run for governor." These reasons led him to offer Mrs. Conte the opportunity to buy his franchise.

13

All of this evidence points to two conclusions: (a) Mr. Bukzam likely knew the figures in the personal financial statement were false and (b) Mr. Bukzam entered into the capital lease and management agreement with the Contes because of Mrs. Contes' personal attributes rather than her net worth. As such, the Court finds that GBAZ did not actually rely on the Contes' personal financial statement.

Even if GBAZ actually relied on the financial statement, its reliance must still have been reasonable. In the Sixth Circuit, courts are to consider five factors when determining whether a creditor's reliance was reasonable:

> (1) whether the creditor had a close personal relationship or friendship with the debtor;
>
> (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust;
>
> (3) whether the debt was incurred for personal or commercial reasons;
>
> (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and
>
> (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*In re Oster*, 474 F. App'x at 425 (quoting *BancBoston Mortg. Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556, 1560 (6th Cir. 1992)).

First, Mr. Bukzam and Mrs. Conte developed a relatively close personal relationship during July 2018 to November 2018 when she worked for him at the

14

franchise.  Second, this period of employment could qualify as "previous business dealings."  But these two factors work against GBAZ's reasonableness.  Rather than create a "relationship of trust," they should have alerted GBAZ to Mrs. Conte's actual financial position.  Mrs. Conte's willingness to work for $9.00 an hour was a red flag and inconsistent with having a net worth in excess of $600,000.  And the fact that Mrs. Conte was willing to forgo her pay during that period to secure a down payment on the capital lease and management agreement was another red flag.  It was inconsistent with someone who, on paper, represented they had the financial means to buy the franchise outright or at least secure financing of their own.

Even if Mr. Bukzam did not acknowledge the red flags above, the discrepancies between the information Mrs. Conte provided on the franchise application and the personal financial statement were additional red flags.  On the franchise application, Mrs. Conte purposefully omitted her total assets, total liabilities, and net worth.  She only provided the value of her home and bank account balances. Based on the franchise application, the Contes' net worth was at most $142,000.  Yet, at the same time, Mrs. Conte provided GBAZ with a financial statement indicating a net worth of $618,000.  The sudden assertion of $250,000 in business inventory, a life insurance policy with a cash surrender value of $175,000,

15

and $30,000 in cash or its equivalent was a red flag that GBAZ should have further investigated. *See, e.g., Advantage Bank v. Starr (In re Starr)*, No. 09-64079, 2012 WL 4714978, at *7 (Bankr. N.D. Ohio Oct. 2, 2012) (quoting *John Deere Co. v. Myers (In re Myers)*, 124 B.R. 735, 743 (Bankr. S.D. Ohio 1991)) ("[A] creditor's reliance on a financial statement is only reasonable if the financial statement is 'complete and contains no apparent inconsistencies.' "). Mr. Bukzam testified that he drove by Mrs. Conte's house and that he saw the car she drove when she came to work. He asserted that based on that information, he had no reason to further investigate. Yet the house and cars represented at most $166,000 of the Contes' net worth. It is unreasonable that Mr. Bukzam would verify what was slightly more than 25 percent of Mrs. Conte's net worth but take at face value the remaining 75 percent.

Even minimal investigation would have revealed that Mrs. Conte's personal financial statement was false. As an initial matter, Mrs. Conte explicitly authorized GBAZ to investigate her background by signing under the "release of information" paragraph on the franchise application. Nothing prevented GBAZ from requesting a statement of the insurance policy's alleged cash surrender value. Similarly, nothing prevented GBAZ from requesting Mrs. Contes' bank statements to verify her $30,000 in cash. GBAZ could have visited where Mrs. Conte stored

16

the purported $250,000 in business inventory and confirmed it actually existed. Or GBAZ could have simply performed a credit check on Mr. and Mrs. Conte. *See, e.g., Mfr.'s Hanover Trust Co. v. Ward (In re Ward)*, 857 F.2d 1082, 1084 (6th Cir. 1988) (requiring that a lender "must investigate creditworthiness and ferret out ordinary credit information"); *Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1167 (6th Cir. 1985) (creditor that obtained credit report made an adequate investigation into debtors' financial condition); *Park Nat'l Bank v. Shilling (In re Shilling)*, No. 12-62931, 2013 WL 4039417, at *5 (Bankr. N.D. Ohio Aug. 7, 2013) (same).

The statute requires *reasonable* reliance to address creditors like GBAZ that "look[] the other way in the face of facts that ought to raise suspicions." *In re Ledford*, 970 F.2d at 1560. While the Court cannot know for certain what GBAZ understood in 2018, the most plausible scenarios are that GBAZ either knew the information in Mrs. Conte's personal financial statement was false or looked the other way when faced with multiple red flags that should have caused it to investigate further. Accordingly, the Court finds that GBAZ did not reasonably rely on the misrepresentations in the Contes' financial statement.

17

2. Intent to Deceive

The last element that GBAZ must prove is that the Contes provided the false financial statement with the intent to deceive. Intent includes both actual intent to deceive and gross recklessness. *In re Oster*, 474 F. App'x at 427; *see also In re Blankenship,* 2019 WL 5304212, at *8.

At trial, Mrs. Conte admitted that she and Mr. Bukzam inflated her net worth to ensure that the franchisor would accept her application. The debtor need not have an intent to deceive a specific creditor. Intent to deceive some creditor is sufficient. *See, e.g.*, 4 Collier on Bankruptcy ¶ 523.08[2][e][i] ("[A] false statement made to a credit reporting agency for general use is unquestionably a basis for excepting the debt from discharge."). Therefore, Mrs. Conte's intent to deceive the franchisor satisfies this element.

Mr. Conte's Liability

GBAZ presented no evidence at trial that Mr. Conte had any involvement in the preparation or submission of the fraudulent personal financial statement. The plain language of § 523(a)(2)(B) requires a statement that "*the debtor* caused to be made or published with intent to deceive." 11 U.S.C. § 523(a)(2)(B) (emphasis added). Therefore, this Court cannot impute Mrs. Conte's fraud on Mr. Conte. *Cf. Bartenwerfer v. Bartenwerfer (In re Bartenwerfer)*, 860 F. App'x 544, 546 (9th

Cir. 2021), *cert. granted sub nom. Bartenwerfer v. Buckley*, 142 S. Ct. 2675 (2022) (imputing fraud onto partner under § 523(a)(2)(A), which focuses on the discharge of "any debt" rather than on the debtor's conduct); *In re Ledford*, 970 F.2d at 1556 (same); *see also* 4 Collier on Bankruptcy ¶ 523.08[3] ("[R]eference to the plain language of the Code answers [whether the fraudulent intent of an agent of the debtor should be imputed to the debtor].  Section 523(a)(2)(B) refers to a statement that '*the debtor* caused to be made or published with intent to deceive.' ").  Therefore, GBAZ has failed to establish the nondischargeability of the judgment against Mr. Conte.

CONCLUSION

For the reasons stated above, GBAZ has failed to establish by a preponderance of the evidence that it reasonably relied on the Contes' misrepresentations in their financial statement.  The Court therefore enters judgment in favor of the debtors.

IT IS SO ORDERED.